UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ARLENE EDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16-cv-00079-JAW |
| | ) | |
| RIVERVIEW PSYCHIATRIC | ) | |
| CENTER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANT MARY MAYHEW'S MOTION TO DISMISS
INDIVIDUAL CAPACITY CLAIMS**

This case arises out of an incident that took place on December 2, 2013, in which staff at Riverview Psychiatric Center allegedly pepper sprayed, restrained, secluded, and failed to treat a patient without good cause. The patient filed a lawsuit against a number of state of Maine defendants in both their official and individual capacities. Mary Mayhew, the Commissioner of the Maine Department of Health and Human Services, moves to dismiss all individual capacity claims brought against her. The Court grants the motion to dismiss with respect to the constitutional claims pursuant to 42 U.S.C. § 1983 because the Plaintiff failed to plead sufficient facts to demonstrate that the Commissioner herself violated the patient's rights or acted or failed to act with deliberate indifference to them. The Court dismisses without prejudice the motion to dismiss the negligent supervision claim under Maine law because this aspect of the motion has not been thoroughly briefed and the Court is

not sufficiently confident about the status of the tort in Maine to grant or deny the motion to dismiss.

## I.   PROCEDURAL BACKGROUND

On December 1, 2015, Arlene Edson filed a complaint in Kennebec County Superior Court for the state of Maine against Riverview Psychiatric Center (Riverview) and a number of other state of Maine entities and individuals, including Mary Mayhew, Commissioner of the Maine Department of Health and Human Services (MDHHS), in her official and individual capacities. *Aff. of John J. Wall, III* Attach. 3 *Compl.* (ECF No. 7). On February 10, 2016, Jamie Meader, a named Defendant, removed the case to this Court. *Notice of Removal* (ECF No. 1). On June 22, 2016, Commissioner Mayhew moved to dismiss the Complaint insofar as it made allegations against her in her individual capacity. *Def. Mary Mayhew's Mot. to Dismiss Individual Capacity Claims* (ECF No. 65) (*Def.'s Mot.*). On July 12, 2016, Ms. Edson filed her opposition to the motion to dismiss. *Pl.'s Opp'n to Def. Mary Mayhew's Mot. to Dismiss Individual Capacity Claims* (ECF No. 71) (*Pl.'s Opp'n*). On July 26, 2016, Commissioner Mayhew filed a reply. *Def. Mary Mayhew's Reply in Supp. of Mot. to Dismiss Individual Capacity Claims* (ECF No. 73) (*Def.'s Reply*).[1]

---

[1]   On May 16, 2016, the Magistrate Judge recommended that the Court grant the Plaintiff's motion to amend her Complaint, *Recommended Decision on Pl.'s Mot. to Amend and Defs.' Mots. to Dismiss* at 4 (ECF No. 52), and on June 8, 2016, the Court affirmed the recommendation. *Order Affirming the Recommended Decision of the Magistrate Judge* (ECF No. 57). On June 8, 2016, the Plaintiff filed her first amended complaint. *First Am. Compl.* (ECF No. 60). On August 5, 2016, after all the memoranda on Commissioner Mayhew's motion to dismiss had been filed, the Plaintiff filed a motion for leave to amend the complaint a second time. *Consent Mot. for Leave to File Second Am. Compl.* (ECF No. 74). The purpose of the motion was to correct "the following scrivener's errors: renumbering the counts; and to remove Defendants Mary Mayhew and Mary L. McEwen from paragraph 120 of the amended complaint." *Id.* at 1. The Court granted the consented-to motion to amend the complaint on August 5, 2016. *Order* (ECF No. 75).

2

## II.    THE ALLEGATIONS IN THE SECOND AMENDED COMPLAINT[2]

### A.    Overview

Arlene Edson has been a patient at Riverview since 2011. *Second Am. Compl.* ¶ 1. She has profoundly serious psychiatric illnesses and was involuntarily committed to Riverview after being found Not Criminally Responsible on arson and assault charges. *Id.* ¶¶ 1, 19. On December 2, 2013, Ms. Edson was pepper sprayed by Riverview employees, restrained in five-point restraints, and kept isolated for hours before anyone responded to her pleas for help. *Id.* ¶ 1. During all times relevant to this civil action, including December 2, 2013, Mary Mayhew was the Commissioner and policymaker for MDHHS. *Id.* ¶¶ 5, 26.

---

In Count VII of the First Amended Complaint, Ms. Edson alleged in paragraph 120: "Defendants Mayhew, McEwen, Lord, Lavigne and Taylor acted recklessly and/or with callous indifference to Ms. Edson's substantive due process rights by subjecting her to unnecessary violence, isolating her from other patients, denying her medical attention, and by concealing the abuse Ms. Edson was subjected to." *First Am. Compl.* ¶ 120. Paragraph 120 in Count VII of the Second Amended Complaint now reads the same way, except it eliminates any reference to Defendants Mayhew and McEwen. *Second Am. Compl.* ¶ 120.

In her motion to dismiss, Ms. Mayhew anticipated the fact that paragraph 120 as it appeared in the First Amended Complaint was an error. *Def.'s Mot.* at 4 n.3. She did not therefore argue that Count VII should be dismissed. As the later amendment of the Complaint does not affect the substance of the pending motion to dismiss, the Court considers the Second Amended Complaint the operative complaint for purposes of the motion.

[2]    Consistent with First Circuit authority, the Court accepts as true the well-pleaded allegations in the Second Amended Complaint and draws all reasonable inferences in the pleader's favor for purposes of the motion only. *Román-Oliveras v. P.R. Elec. Power Auth.*, 655 F.3d 43, 45 (1st Cir. 2011). The Court may supplement such "facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 514 (1st Cir. 2016) (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

The Court has recited only those facts relevant to Ms. Edson's claims against Mary Mayhew based on her individual liability because Commissioner Mayhew has not requested dismissal of the official capacity claims. *Def.'s Mot.* at 4 n.2.

B.      Riverview

MDHHS is a state agency responsible for overseeing Riverview.  *Id.* ¶ 14.
Riverview is a state-operated forensic hospital located in Augusta, Maine that
provides psychiatric services to the corrections and judicial systems, including care
for those committed under Maine statutes for observation and evaluation, persons
found not criminally responsible, and for those found incompetent to stand trial.  *Id.*
¶ 15.   Since 1990, Riverview has been operating under a Consent Decree and
incorporated Settlement Agreement.  *Id.* ¶ 16.   According to the Consent Decree,
Riverview[3] failed to meet constitutional, statutory, and regulatory standards which
deprived patients of fundamental rights, including freedom from restraint and
freedom from abuse.  *Id.* ¶ 17.   The Consent Decree is a contract between MDHHS
and class members, which includes all patients admitted to Riverview on or after
January 1, 1988; Ms. Edson is a member of this protected class.  *Id.* ¶ 18.

Riverview is a Medicaid and/or Medicare participating hospital that has
accepted federal funds.  *Id.* ¶ 20.   Following two highly publicized incidents of client
abuse and subsequent investigation, the United States Centers for Medicaid and
Medicare Services (CMS) found that Riverview violated constitutional, statutory, and
regulatory standards.  *Id.* ¶ 21.   As a result of Riverview's multiple violations, it was
decertified by CMS on or about September 2, 2013 for failing to comply substantially
with Title XVIII of the Social Security Act and implementing regulations of the

---

[3]      Technically, the Consent Decree involved Augusta Mental Health Institute (AMHI), but after
entering into the Consent Decree, AMHI changed its name to Riverview.  Except as otherwise required,
the Court has used Riverview to refer to the state-operated mental health institution in Augusta before
and after the name change.

4

Secretary of Health and Human Services specified at 42 C.F.R. Part 482, Conditions of Participations for Hospitals. *Id.* ¶ 22. For approximately two years, Riverview operated without court supervision under the Consent Decree until about October 25, 2013, when State Superior Court supervision was reinstated. *Id.* ¶ 23.

### C.   The December 2, 2013 Incident

A special relationship existed between Arlene Edson and Riverview because the law required her to be in Riverview's physical custody. *Id.* ¶ 24. As a result of the special relationship, Mary Mayhew had a duty to control the conduct of parties to prevent them from harming Ms. Edson. *Id.* ¶ 25. On December 2, 2013, Ms. Edson was a forensic patient at Riverview, housed in the Lower Saco Unit, which Riverview used to house forensic patients. *Id.* ¶¶ 28–29.

During the evening of December 2, 2013, William Lord, Jr. was the Registered Nurse and the Nurse on Duty in the Lower Saco Unit. *Id.* ¶ 30. During that evening, Kelly Lavigne and Carlos Taylor, III were working as corrections officers (COs) in the Lower Saco Unit under contract between Riverview and/or MDHHS and the Maine Department of Corrections. *Id.* ¶ 31. Corrections Officers Lavigne and Taylor wore video camera recording devices while on duty at Riverview that evening. *Id.* ¶ 32. Riverview also had surveillance video cameras, which recorded the hall and nurses' station in the Lower Saco Unit. *Id.* ¶ 33.

On December 2, 2013 at approximately 8:15 p.m., Ms. Edson left a bathroom and walked into a conference room. *Id.* ¶ 34. When she walked into the conference room, Ms. Edson was followed by a corrections officer but no clinical staff. *Id.* ¶ 35.

Ms. Edson asked to be left alone, but the corrections officer confronted her about a comment she had made earlier in the evening. *Id.* ¶ 36. Ms. Edson left the conference room and began to undress as she walked back to her room. *Id.* ¶ 37. Nurse Lord said to Ms. Edson: "I'll go with a three-strike rule basically, if we gotta do that." *Id.* ¶ 38. After that, Ms. Edson put her clothing outside the door leading to the hallway. *Id.* ¶ 39. Nurse Lord and three other Riverview employees saw Ms. Edson put her clothes in the hallway. *Id.* ¶ 40. A corrections officer picked up Ms. Edson's clothing and placed it in the doorway of her room, after which Ms. Edson kicked her clothes back into the hallway. *Id.* ¶ 41. Out of view of Riverview's surveillance cameras, a corrections officer picked up Ms. Edson's clothes and removed them from the hallway. *Id.* ¶ 42.

On December 2, 2013 at approximately 8:58 p.m., Ms. Edson was standing naked in her room with her back against a wall, shoulders hunched forward, displaying no signs of assaultive, violent or aggressive behavior. *Id.* ¶ 43. Without provocation, Corrections Officer Lavigne sprayed Ms. Edson with pepper spray, causing her to cough, spit, choke and double over in pain. *Id.* ¶ 44. Corrections Officer Taylor asked Nurse Lord: "Do you want [Ms. Edson] cuffed?" *Id.* ¶ 45. After Nurse Lord said "yes," Corrections Officer Taylor handcuffed Ms. Edson while she was on the floor, even though she was not assaultive, violent or aggressive. *Id.* ¶ 46.

Ms. Edson told Corrections Officers Lavigne and Taylor that she could not breathe and asked for a shower to remove the pepper spray, but her requests were ignored. *Id.* ¶ 47. Ms. Edson was wrapped in a sheet, taken to another room, placed

on her back, and placed in five-point restraints. *Id.* ¶ 48. Ms. Edson told those present that the pepper spray was running down her nose and once again begged for a shower to remove the pepper spray. *Id.* ¶ 49. While Ms. Edson was begging for a shower, a male Riverview staff member could be heard on the recording coughing from the pepper spray used against Ms. Edson. *Id.* ¶ 50. A video recording shows that at 9:04 p.m., Ms. Edson continued to beg for a shower and asked for someone to speak with the nurse. *Id.* ¶ 51. The video recording shows a mental health worker wiping his or her face off with a wash cloth in an effort to remove the pepper spray affecting him or her. *Id.* ¶ 52.

On December 2, 2013, Nurse Lord talked on the telephone and stood at the nurses' station for approximately fifteen minutes after Ms. Edson was pepper sprayed. *Id.* ¶ 53. Ms. Edson continued to cough, beg and whimper from the effects of the pepper spray and was denied a blanket and the water she asked for. *Id.* ¶ 54. A Riverview video recording shows Ms. Edson was still restrained at 9:18 p.m., while she continued to ask for a nurse. *Id.* ¶ 55. Ms. Edson told a Riverview nurse on duty that her side was burning, and in response, Staff said: "If it was burning that bad, you would know what to do to get out of here, but you aren't," after which they left her still in restraints with the corrections officers. *Id.* ¶¶ 56–57. Riverview's surveillance video shows that Ms. Edson was passive and cooperative throughout these events. *Id.* ¶ 58.

Ms. Edson was not seen by a nurse until 11:30 p.m., almost three hours after she was pepper sprayed. *Id.* ¶ 59. The nurse who saw Ms. Edson discussed

"boundaries" with her, after which she released her from the restraints and allowed her to take a shower. *Id.* ¶ 60. Ms. Edson suffered extreme physical and mental pain and humiliation by being pepper sprayed and restrained without cause or provocation while Riverview staff and corrections officers ignored her pleas for help. *Id.* ¶ 61.

### D.   Riverview Policies and Arlene Edson

Riverview's policy on the use of restraints stated that physical "[r]estraint will be used only when there exists an imminent risk of danger to the individual or others and no other safe and effective intervention is possible." *Id.* ¶ 62. Riverview policy defined "imminent threat" as "making verbal threats to harm, posturing to physically harm, brandishing an item that could be used as a weapon, concealing a weapon that they are refusing to surrender, taking a hostage, holding an item to themselves and threatening to harm themselves or others, or attempting to escape." *Id.* ¶ 63. Ms. Edson's behavior during the events of December 2, 2013 did not satisfy the definition of "imminent threat" under Riverview policy. *Id.* ¶ 64.

Riverview's policy on the use of restraints also stated: "Law enforcement restraints will never be used for the purposes of discipline, coercion, active treatment, staff convenience or as a replacement for adequate levels of staff." *Id.* ¶ 65. Riverview policy defined abuse as "the infliction of injury, unreasonable confinement, intimidation or cruel punishment that causes, or is likely to cause, physical harm or pain or mental anguish, sexual abuse or sexual exploitation."[4] *Id.* ¶ 66. In accordance

---

[4]      Paragraph sixty-six reads: "Riverview's policies mandated that allegations of patient mistreatment, including abuse, neglect, or exploitation, and defined abuse as 'the infliction of injury, unreasonable confinement, intimidation or cruel punishment that causes, or is likely to cause, physical

with Riverview's policies, staff was responsible for taking "action to protect clients from abuse" and to immediately "report[] abuse . . . which they have witnessed or have knowledge of." *Id.* ¶ 67. On December 2, 2013, Riverview's Documentation Standards and Requirements' Protocol and Procedure stated: "Accurate, detailed documentation shows the extent and quality of care provided, the outcome of that care and the treatment and education that the client still needs." *Id.* ¶ 68.

The Defendants actively concealed the abuse inflicted on Ms. Edson by Riverview staff and corrections personnel.[5] *Id.* ¶ 69. The Defendants failed to follow the law, policies, guidelines, protocols and terms of the Consent Decree in regard to the events leading to the abuse inflicted on Ms. Edson. *Id.* ¶ 70. The Defendants filled out false and misleading paperwork and reports about what happened to Ms. Edson. *Id.* ¶ 71. A December 2, 2013 nursing note falsely stated that Ms. Edson was "unable to deescalate with multiple attempts . . . began banging head and kicking, hitting walls. [Corrections Officers] intervened as client was kicking holes and picking shards of wall, warned client several times." *Id.* ¶ 72. In fact, Ms. Edson did not bang her head, kick or hit the walls, display any threatening behavior, or put a hole in the wall of her room during the incident. *Id.* ¶ 73.

---

harm or pain or mental anguish, sexual abuse or sexual exploitation.'" *Second Am. Compl.* ¶ 66. The first part of this paragraph is garbled and the Court has not included it.

[5]      By including these factual allegations regarding the concealment of the true facts of this incident, the Court does not treat them as made against Mary Mayhew. *Second Am. Compl.* ¶¶ 67–84. Even taking the allegations in the Second Amended Complaint as true, the Court knows of no basis for Ms. Edson to claim that Ms. Mayhew personally knew about this incident on or about the time it occurred or that she was directly involved in any way with the alleged cover-up. In fact, Ms. Edson's counts against Ms. Mayhew do not include any theory of her direct, contemporaneous involvement in this event. The Court included the allegations to provide the context for Ms. Edson's improper supervision claims against Ms. Mayhew. *See id.* Counts IV, V, VI, IX, and XII.

On December 2, 2013, Julia Wise, PA-C, filled out a Medical Staff Restraint and SRC Progress Note which stated Ms. Edson "was maced, put back in restraints, see CO/Nursing notes for more details" at 9:00 p.m. and never mentioned the use of pepper spray against Ms. Edson.[6]  *Id.* ¶ 74.  Riverview Psychiatric Center Incident Report #5255 dated December 2, 2013 and signed by Nurse Lord at 9:00 p.m. stated: "Client cont'd banging, kicking, property destruction despite several attempts to redirect and deescalate verbally . . . CO's Lavigne/Taylor intervened, gave the client several warnings to gain control of behavior . . . Client sprayed by CO-behavior ceased immediately-staff/patient [without] injury."  *Id.* ¶ 75.

Riverview's "Seclusion and Restraint Events Policy" stated: "Seclusion and restraints are considered emergency measures or interventions of last resort to protect clients in imminent danger of harming him/herself or others . . . seclusion and restraint will be used only when there exists an imminent risk of danger to the individual or others and no other safe and effective intervention is possible."  *Id.* ¶ 76.  Ms. Edson was pepper sprayed and placed in five-point restraints, even though she was not in imminent danger of harming herself or others.  *Id.* ¶ 77.

Riverview's "Seclusion and Restraint Events Policy" required a physician, physician's assistant, or nurse practitioner to evaluate the client within thirty minutes of the initiation of restraint and to document the findings of the evaluation

---

[6]     Again, the Court is required to accept the well-pleaded allegations in a complaint as true for purposes of a motion to dismiss.  The Court has qualms about this allegation.  In her December 2, 2013 note, Physicians' Assistant (PA) Wise expressly mentions that Ms. Edson was maced.  *Second Am. Compl.* ¶ 74 ("Ms. Edson 'was maced'").  To allege that PA Wise did not mention pepper spray is technically true, but it assumes that mace is not equivalent to pepper spray in this context, that PA Wise would have known the difference between mace and pepper spray, and that she would have known specifically which of the two self-defense products was actually used.

in a progress note.  *Id.* ¶ 78.  Riverview had no documentation showing that Ms. Edson was given a physical examination after she was pepper sprayed.  *Id.* ¶ 79.

Even though Maine law required Riverview staff and corrections personnel to immediately report Ms. Edson's abuse to MDHHS, her abuse was not reported to Maine's Adult protective services until February 27, 2014.  *Id.* ¶ 80.

Between February 27, 2014 and March 10, 2014, Thomas Woodman, RN, HSC II and Alelia Hilt-Lash, RN, BSN, MBA, HSS conducted an investigation at Riverview, #ME00015398.  *Id.* ¶ 81.  Investigation #ME00015398 substantiated the complaint for abuse and inappropriate use of restraints on Ms. Edson.  *Id.* ¶ 82.

## III.   THE COUNTS AGAINST MARY MAYHEW

The Second Amended Complaint contains sixteen counts; Ms. Edson directs six against Ms. Mayhew: (1) Count IV—failure to train pursuant to 42 U.S.C. § 1983; (2) Count V—supervisory liability pursuant to 42 U.S.C. § 1983; (3) Count VI—custom, practice and policy liability pursuant to 42 U.S.C. § 1983; (4) Count VIII—Americans with Disabilities Act (ADA) pursuant to 42 U.S.C. § 12132; (5) Count IX—equal protection pursuant to 42 U.S.C. § 1983; and (6) Count XII—negligent supervision under Maine state law. *Second Am. Compl.* at 1–26.   Ms. Edson's Second Amended Complaint specifies that she is bringing Count VIII, the ADA claim, against Commissioner Mayhew only in her official capacity.  *Id.* at 18 ("*Riverview Psychiatric Center, Mayhew & McEwen in their Official Capacities*").   Therefore, the pending motion does not reach Count VIII.  The remaining five Counts against Ms. Mayhew,

all of which make claims against her in her individual capacity, may be broadly categorized into two theories: constitutional rights claims and a state tort claim.[7]

## IV.   THE PARTIES' POSITIONS

### A.   Mary Mayhew's Motion

In her motion to dismiss, Mary Mayhew moves for the dismissal of the Counts against her only to the extent those Counts assert claims against her in her individual, not official capacity. *Def.'s Mot.* at 1.  Regarding the constitutional rights claims, Ms. Mayhew points out that a supervisor may not be held responsible under § 1983 based solely on her position of authority and instead the law requires that the plaintiff allege some individual misconduct on the part of the supervisor to violate the plaintiff's constitutional rights. *Id.* at 5–6.  Citing First Circuit law, Ms. Mayhew says that a supervisor may be liable under § 1983 if she is the "primary violator or direct participant in the right-violating incident" or if she "supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *Id.* at 6 (quoting *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 43–44 (1st Cir. 1999))).  Ms. Mayhew quotes the First Circuit's three-part test for the deliberate indifference inquiry: "(1) 'that the officials had knowledge of facts,' from which (2) 'the official[s] can draw the inference'

---

[7]     The Second Amended Complaint does not state whether Ms. Edson is bringing suit against Commissioner Mayhew on both an official and individual basis. *Second Am. Compl.*  But Ms. Edson's response clarifies that Counts IV, V, VI, IX, and XII in the First Amended Complaint, which are the same counts in the Second Amended Complaint, are being brought against Commissioner Mayhew in her official and individual capacities. *Pl.'s Opp'n* at 2.

(3) 'that a substantial risk of serious harm exists.'" *Id.* at 6 (quoting *Ramírez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 20 (1st Cir. 2014) (quoting *Ruiz-Rosa v. Rullán*, 485 F.3d 150, 157 (1st Cir. 2007))). She says that the plaintiff must also demonstrate that there is a "strong causal connection between the supervisor's conduct and the constitutional violation," *id.* (quoting *Ramírez-Lluveras*, 759 F.3d at 19), and that the supervisor's conduct "led <u>inexorably</u> to the constitutional violation." *Id.* at 6–7 (quoting *Ramírez-Lluveras*, 759 F.3d at 19–20 (emphasis added) (quoting *Hegarty v. Somerset Cty.*, 53 F.3d 1367, 1380 (1st Cir. 1995))). Finally, she notes that the "supervisor must have notice of the unconstitutional condition said to lead to the claim." *Id.* at 7 (quoting *Ramírez-Lluveras*, 759 F.3d at 20).

Applying these standards, Ms. Mayhew sees three potential bases in the Second Amended Complaint for liability: (1) that she was involved in the decision to place correctional officers at Riverview; (2) that she failed to properly train Riverview staff; and (3) that she failed to properly supervise Riverview staff. *Id.* Turning to the first theory, the placement decision, Ms. Mayhew points to the allegations in Ms. Edson's Count IV, where Ms. Edson claims that Ms. Mayhew with Mary Louise McEwen and William Lord, Jr. made a decision "to use corrections officers at Riverview" and to "put the officers in direct contact with vulnerable and mentally ill at-risk patients, including Ms. Edson." *Id.* (quoting *Second Am. Compl.* ¶ 101). Ms. Mayhew argues that this decision "does not support a Section 1983 claim against [her]" because this decision did not lead "'inexorably' to Ms. Edson being pepper-sprayed and placed into restraints." *Id.* Even if Ms. Edson's complaint could be

13

construed as meeting this standard, Ms. Mayhew contends that Ms. Edson's complaint does not allege facts sufficient to establish that, in staffing Riverview with corrections officers, she was deliberately indifferent as to the consequences of this decision on the civil rights of patients, including Ms. Edson, or that she had knowledge of facts from which she could have drawn the inference that to do so would place the patients at a "substantial risk of serious harm." *Id.* at 7–8 (quoting *Ramírez-Lluveras*, 759 F.3d at 20).

Regarding the second theory, failure to train, Ms. Mayhew notes that Ms. Edson has alleged in Count IV that she, Ms. McEwen and Mr. Lord "failed to train Riverview employees [on] how to deal with, interact, and protect mentally ill patients." *Id.* at 8 (quoting *Second Am. Compl.* ¶ 102). Even assuming that this allegation is sufficient to allege inadequate training, Ms. Mayhew argues that there are no specific allegations that she, "the head of the entire Department of Health and Human Services, was responsible for training Riverview employees." *Id.* Ms. Mayhew contends that without specific allegations, this theory amounts to an attempt to hold Ms. Mayhew responsible under the doctrine of respondeat superior, which is not applicable to § 1983 claims. *Id.* at 9.

Finally, on the third theory, the failure to supervise found in Count VI, Ms. Mayhew quotes the allegation, which states that she failed to end a "workforce culture" that "made patient abuse at Riverview likely because staff members routinely provoked responses from patients and ostracized and/or marginalized employees who reported patient abuse." *Id.* (quoting *Second Am. Compl.* ¶ 115).

14

Here, Ms. Mayhew argues that there is no allegation that she was "directly involved in the management of Riverview such that she can be held responsible for the December 2 incident." *Id.* In support of her position, Ms. Mayhew cites *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and maintains that the Supreme Court's dismissal of the Attorney General and the Director of the Federal Bureau of Investigation suggests the same result should obtain here. *Id.* at 9–10. She also cites *Feliciano-Hernández v. Pereira-Castillo*, 663 F.3d 527, 533–34 (1st Cir. 2011), where the First Circuit concluded that similar allegations against "very high-level officials" with "vast responsibilities" could not be subject to suit based on "conclusory allegations." *Id.* at 10–11.

Next, Ms. Mayhew maintains that even if Ms. Edson has successfully stated a § 1983 claim, Ms. Mayhew is entitled to qualified immunity "insofar as [her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 11 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

Finally, Ms. Mayhew says that Ms. Edson has failed to state a negligent supervision claim under Maine law. *Id.* at 13–15. Ms. Mayhew argues that Maine law allows negligent supervision tort claims to proceed only against an employer, not against an individual supervisor, that there is no allegation she directly supervised any of the direct actors in this case, and that there is no allegation that any of the individuals directly involved were ever previously involved in a similar incident such

15

that she would be put on notice of the potential for an incident like the one alleged here. *Id*. at 14–15.

### B.     Arlene Edson's Response

In general, Ms. Edson agrees with the analytic framework set forth in Ms. Mayhew's motion concerning § 1983 claims based on individual supervisory liability. *Pl.'s Opp'n* at 4–5. Ms. Edson first says that her constitutional rights were violated by Kelly Lavigne, Carlos Taylor, III, and William Lord, Jr., when they pepper-sprayed, handcuffed and restrained her. *Id*. at 5. Although she concedes that Ms. Mayhew did not personally participate in the pepper-spraying, handcuffing or restraint, she points out that her Complaint alleges that "it was Mayhew who decided to place [COs] at Riverview with vulnerable, mentally ill patients" and, "[a]fter being put on notice that the presence of COs [was] placing Riverview patients in immediate jeopardy, Mayhew continued to allow them to remain at Riverview, armed with handcuffs and pepper spray."[8]  *Id*. at 5.

Ms. Edson argues that Ms. Mayhew's actions in placing COs "armed with handcuffs, Tasers and pepper spray at Riverview, and her failure to remove the COs, amounted to deliberate indifference." *Id*. at 6. Ms. Edson points to the following as evidence of Ms. Mayhew's prior notice of the potential for constitutional violations: (1) the Consent Decree between a certified class of plaintiffs and the state of Maine

---

[8]      One of the mysteries in this case is when precisely Commissioner Mayhew made the decision to place COs in the forensic unit called the Lower Saco Unit and when they were actually deployed there.  The Court searched the record and could find no direct reference to either date.  In her reply, Commissioner Mayhew concedes that her May 24, 2013 email shows that she "was aware that correctional officers carried pepper spray." *Def.'s Reply* at 3–4 n.1.  This leads the Court to infer that Commissioner Mayhew had made the decision to deploy COs by May 24, 2013 and that they were on Lower Saco by then.

16

from 1990, concerning what was then Augusta Mental Health Institute's deprivation of fundamental rights of its patients, including freedom from restraint and abuse, *Second Am. Compl.* Attach. 1 *Settlement Agreement* (*Consent Decree*); (2) a 2013 CMS Statement of Deficiencies Report of May 10, 2013, *Pl.'s Opp'n* Attach. 1 *Summ. Statement of Deficiencies* (*CMS 2013 Report*); (3) Ms. Mayhew's May 23, 2013 email about COs and pepper spray, *id.* Attach. 2 *Email from Mary Mayhew to Michael Cianchette and Kevin Wells* (*Mayhew May 2013 Email*); and (4) the issuance of a conditional license from the Maine Division of Licensing and Regulatory Services on September 13, 2013, *Second Am. Compl.* Attach. 2 *Prelim. Statement of Whistleblower Protection Act Violation* at 4 n.3 (*Conditional License*). *Pl.'s Opp'n* at 6–10. Ms. Edson says that these documents placed Ms. Mayhew on notice of patient abuse at Riverview but that she failed to act to correct the abuses, justifying the charge of deliberate indifference. *Id.* at 10–11.

Ms. Edson acknowledges that she must also prove causation, namely that Ms. Mayhew's conduct led inexorably to the constitutional violation. *Id.* at 11. However, she states that she can "prove causation by showing inaction in the face of a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'" *Id.* (quoting *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994)). Ms. Edson cites the 1990 Consent Decree, the 2013 CMS Report, the May 2013 Mayhew email, and the 2013 Conditional License and quotes excerpts from the post-incident investigation report as evidence that there was a pre-existing problem of abuse with the COs of which Ms. Mayhew had actual and constructive notice. *Id.* at

17

11–12.  She argues that "[h]ad Mayhew removed the COs entirely, or, at a minimum, removed the handcuffs and pepper spray, [her] constitutional rights would not have been violated on December 2, 2013." *Id.* at 12.

Regarding Ms. Mayhew's alleged failure to train and supervise, Ms. Edson points out that Ms. Mayhew was "the Commissioner and policymaker for DHHS and Riverview." *Id.* at 12.  She alleges that the Consent Decree outlines "specific training obligations for Mayhew, as Commissioner of the Department of Health and Human Services." *Id.* (citing *Consent Decree* ¶¶ 34(a), 118–19, 205–07, 213–19).  Ms. Edson asserts that Jeanne Carroll, a whistleblower, believes that Ms. Mayhew terminated her in part for bringing the abuse of Ms. Edson to light. *Id.*  Ms. Edson also highlights complaints that other Riverview workers made about the adequacy of training and supervision. *Id.* at 13.  She claims that this lack of training and oversight caused the COs and others to abuse her. *Id.* at 13–14.

Addressing Ms. Mayhew's qualified immunity, Ms. Edson describes the legal standard to be "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Id.* at 14 (quoting *Ayotte v. Barnhart*, 973 F. Supp. 2d 70, 78 (D. Me. 2013) (citing *Rocket Learning Inc. v. Rivera-Sánchez*, 715 F.3d 1, 8 (1st Cir. 2013) (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)))).  Ms. Edson rejects Ms. Mayhew's contention that her position as Commissioner makes her immune because, she says, Ms. Mayhew's "conduct violated clearly established statutory and constitutional rights, of which a

18

reasonable person would have known." *Id.* at 15.  She claims that Ms. Mayhew ignored "warnings" about the potential for constitutional violations.  *Id.* at 16.  She maintains that Ms. Mayhew was placed "on luminously clear notice that she might become liable in her supervisory capacity should her actions and omissions contribute to the continuation of the pathologies described in the Consent Decree and the CMS Statement of Deficiencies." *Id.* at 16–17.

Finally, as to the negligent supervision claim under Maine state law, Ms. Edson disputes Ms. Mayhew's contention that her supervisory position eliminates her duty of care to Riverview's patients, including herself.  *Id.* at 17–18.  Ms. Edson contends that Ms. Mayhew owed a special duty to her because she was required by law to be in the physical custody of Riverview, *id.* at 17, and that Ms. Mayhew breached that duty by placing the COs in Riverview and by allowing them to remain there.  *Id.* at 18.

### C.    Mary Mayhew's Reply

In her reply, Ms. Mayhew asserts that there is "little dispute regarding the applicable law." *Def.'s Reply* at 1.  Ms. Mayhew points out that Ms. Edson has conceded that she cannot be held liable individually on the theory of respondeat superior and that she may be legally responsible only if through her own actions, she has violated the Constitution.  *Id.*  Ms. Mayhew observes that Ms. Edson has agreed that she cannot maintain a claim against her merely by showing that one of her subordinates violated Ms. Edson's constitutional rights; Ms. Edson has accepted the obligation to show that Ms. Mayhew's "action or inaction was affirmatively linked to

the behavior in the sense that it could be characterized as supervisory encouragement, condonation [or] acquiescence or gross negligence amounting to deliberate indifference." *Id.* (quoting *Pl.'s Opp'n* at 4). Finally, Ms. Mayhew says that Ms. Edson has admitted that she must demonstrate that Ms. Mayhew's conduct "led inexorably to the constitutional violation." *Id.* (quoting *Pl.'s Opp'n* at 4).

Ms. Mayhew asserts that Ms. Edson has made no serious effort to argue that she "somehow encouraged, condoned, or acquiesced in the behavior at issue here." *Id.* at 2. Ms. Mayhew frames Ms. Edson's argument as being premised on the faulty notion that Ms. Mayhew could have foreseen that this incident would have occurred. *Id.* Specifically, Ms. Mayhew disputes Ms. Edson's contention that the Consent Decree entered into in 1990 can plausibly be construed as placing her on notice about the possibility of an incident occurring on December 2, 2013. *Id.* at 3. Ms. Mayhew makes a similar argument about the September 13, 2013 conditional license. *Id.* Finally, Ms. Mayhew disagrees with Ms. Edson's argument that the May 10, 2013 Statement of Deficiencies placed her on notice of anything about the COs' potential for harm to Riverside patients because the report dealt with the conduct of the Kennebec County Sheriff's Office. *Id.* at 4. Ms. Mayhew also distinguishes the facts in *Guadalupe-Báez v. Pesquera*, 819 F.3d 509 (1st Cir. 2016), a case upon which Ms. Edson relied in her opposition. *Id.* at 4–5.

Regarding the deliberate indifference claim, Ms. Mayhew stresses that to be successful, a plaintiff must demonstrate a "strong causal connection between the supervisor's conduct and the constitutional violation," which requires "proof the

20

supervisor's conduct led <u>inexorably</u> to the constitutional violation."   *Id.* at 5–6
(quoting *Ramírez-Lluveras*, 759 F.3d at 19–20) (emphasis in original).   Ms. Mayhew
also quotes the First Circuit as saying that a plaintiff may "prove causation by
showing inaction in the fact of a 'known history of widespread abuse sufficient to alert
a supervisor to ongoing violations'" and "isolated instances of unconstitutional
activity" are not sufficient.   *Id.* at 6 (quoting *Guadalupe-Báez*, 819 F.3d at 515
(quoting *Maldonado-Denis*, 23 F.3d at 582)).   Applying these standards, Ms. Mayhew
contends that Ms. Edson has not alleged a "known history of widespread abuse" as
required by the law.   *Id.*

Finally, turning to the failure to train and supervise allegation, Ms. Mayhew
argues that Ms. Edson "fails to allege facts establishing that Commissioner Mayhew,
the head of DHHS, was somehow responsible for supervising and training individual
Riverside employees."   *Id.* at 7.   As Ms. Mayhew views it, Ms. Edson is attempting to
hold her responsible under the theory of respondeat superior, which is not allowed
under § 1983.   *Id.*   Furthermore, to prove the failure to train and supervise theory,
Ms. Edson would have to demonstrate that Ms. Mayhew was on notice that conduct
such as that at issue here was likely, and Ms. Mayhew contends Ms. Edson has not
alleged such notice.   *Id.*

## V.   LEGAL STANDARD FOR MOTION TO DISMISS

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim
upon which relief can be granted."   FED. R. CIV. P. 12(b)(6).   Under the general
pleading standards, a complaint must contain "a short and plain statement of the

21

claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the United States Supreme Court elaborated on this pleading standard in the context of a motion to dismiss: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane." *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citing *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

## VI.   DISCUSSION

### A.   Individual Capacity Claims Under § 1983

Mary Mayhew's motion has been narrowly drawn to challenge only one aspect of Ms. Edson's Second Amended Complaint, namely whether Ms. Edson has alleged sufficient facts to state claims against Ms. Mayhew as an individual. *Def.'s Mot.* at 1 ("Mary Mayhew . . . respectfully requests that the individual capacity claims plaintiff

Arlene Edson asserts in her [Second] Amended Complaint be dismissed").  In this motion to dismiss, Mary Mayhew has not addressed Ms. Edson's claims against her in her capacity as Commissioner of MDHHS.  *Id.* at 4 n.2 ("Commissioner Mayhew does not presently seek dismissal of official capacity claims").

As the First Circuit observed, "[u]nlike an official-capacity § 1983 claim, in which the state itself is liable for damages, an individual-capacity § 1983 claim threatens the personal assets of the state officer only."  *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 108 (1st Cir. 2015) (citing *Hafer v. Melo*, 503 U.S. 21, 25 (1991)).  As a consequence, a state official "sued in [her] personal capacity cannot invoke a defense of sovereign immunity."  *Id.*  At the same time, a "general executive official," like Ms. Mayhew, is protected by "qualified immunity."  *Id.* at 109 (citing *Harlow*, 457 U.S. at 807).  "[Q]ualified immunity shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Alfano v. Lynch*, No. 16-1914, 2017 WL 430077, at *2 (1st Cir. Feb. 1, 2017) (quoting *Matalon v. Hynnes*, 806 F.3d 627, 632–33 (1st Cir. 2015) (quoting *Harlow*, 457 U.S. at 818)).  Ms. Edson advances four theories to show that Ms. Mayhew, in her individual capacity, violated Ms. Edson's constitutional rights: (1) failure to act; (2) failure to train; (2) unlawful custom, practice, and policy; and (4) equal protection violations.

### 1.    Failure to Act

In Count V, Ms. Edson asserts a § 1983 claim against Ms. Mayhew premised on a theory of supervisory liability alleging that Ms. Mayhew knew about the patient abuse and failed to act. *Second Am. Compl.* ¶¶ 108–114. More specifically, she argues that "[a]fter being put on notice that the presence of COs [was] placing Riverview patients in immediate jeopardy, Mayhew continued to allow them to remain at Riverview, armed with handcuffs and pepper spray." *Pl.'s Opp'n* at 5.

It is axiomatic that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior," *Sanchez*, 590 F.3d at 49 (quoting *Iqbal*, 556 U.S. at 676), nor can liability rest solely on the supervisor's position of authority. *Guadalupe-Báez*, 819 F.3d at 515 (citing *Ramírez-Lluveras*, 759 F.3d at 19). Rather, supervisor officials may only be held liable "if the plaintiff can establish that her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization." *Rodríguez-García v. Miranda-Marín*, 610 F.3d 756, 768 (1st Cir. 2010) (citing *Rodriguez-Garcia v. Mun. of Caguas*, 495 F.3d 1, 10 (1st Cir. 2007)). In other words, a supervisor may be held liable under § 1983 either as a "primary violator or direct participant in the rights-violating incident" or under a deliberate indifference theory. *Sanchez*, 590 F.3d at 49.

As Ms. Mayhew concedes, as she must, that for purposes of this motion to dismiss, "Ms. Edson's allegations that she was pepper-sprayed for no reason and then restrained for three hours before she was allowed to wash away the pepper spray are taken as true." *Def.'s Reply* at 2. By the same token, Ms. Edson concedes, as she

must, that Ms. "Mayhew did not personally participate in the pepper spraying, handcuffing or restraint." *Pl.'s Opp'n* at 5. Ms. Edson's concession eliminates the "primary violator or direct participant" theory against Ms. Mayhew.

The Court turns to Ms. Edson's "deliberate indifference" theory of supervisor liability. To establish "deliberate indifference," the plaintiff must show "(1) that the officials had knowledge of facts, from which (2) the officials can draw the inference (3) that a substantial risk of serious harm exists." *Guadalupe-Báez*, 819 F.3d at 515 (internal quotations omitted). However, "deliberate indifference alone does not equate with supervisory liability; a suitor also must show causation." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998) (citing *Maldonado-Denis*, 23 F.3d at 582); *see also Guadalupe-Báez*, 819 F.3d at 515 ("Causation remains an essential element, and the causal link between a supervisor's conduct and the constitutional violation must be solid"). "This causation requirement 'contemplates proof that the supervisor's conduct led inexorably to the constitutional violation.'" *Guadalupe-Báez*, 819 F.3d at 515 (quoting *Hegarty,* 53 F.3d at 1380). "That is a difficult standard to meet but far from an impossible one: a plaintiff may, for example, prove causation by showing inaction in the face of a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'" *Id.* (quoting *Maldonado-Denis,* 23 F.3d at 582). "'[I]solated instances of unconstitutional activity' will not suffice." *Id.* (quoting *Maldonado-Denis,* 23 F.3d at 582). Finally, a supervisor must be on notice of the violation. *Id.* (citing *Ramirez-Llulveras*, 759 F.3d at 20). Such notice may be actual or constructive. *Id.*

To support her claim that Ms. Mayhew's inaction amounted to deliberate indifference, Ms. Edson points to four documents, the contents of which the Court accepts as true for purposes of the motion to dismiss: (1) the 1990 Consent Decree, (2) the May 10, 2013 CMS Statement of Deficiencies Report, (3) the Mayhew May 23, 2013 email, and (4) the 2013 Conditional License. *Pl.'s Opp'n* at 6–11. Essentially, Ms. Edson argues that these documents put Ms. Mayhew on notice that the presence of COs on the Lower Saco Unit created a substantial risk of harm of unlawful restraint and abuse at Riverview. *Id.* at 6.

The Consent Decree, in effect since 1990, originated from a fifteen count complaint made by patients alleging deprivations of rights, including, among others, freedom from unnecessary seclusion and restraint and protection against physical and psychological abuse. *Consent Decree* ¶ 6. The Consent Decree establishes the standards governing Riverview's treatment of patients, including standards for the use of seclusion, restraint, and protective devices, *id.* ¶¶ 180–191, abuse, neglect, and exploitation, *id.* ¶¶ 192–97, and training, *id.* ¶¶ 213–19. The Consent Decree also states that the "Commissioner and Department of Human Services shall be responsible for assuring that each class member public ward is provided all the benefits of this Agreement. On a quarterly basis, they shall prepare and issue a report regarding each such ward identifying the treatment plan for that period, the steps taken to comply with the treatment plan, any obstacles identified in achieving the stated goals, and plans for overcoming such obstacles, if any." *Id.* ¶ 281.

Ms. Edson did not cite any specific provision of the Consent Decree that addresses the presence of COs at Riverview. Therefore, the only implication from the Consent Decree favorable to Ms. Edson's theory of individual responsibility against Ms. Mayhew is that by virtue of the Consent Decree, Ms. Mayhew was on notice that at some point in the past and continuing into the present, sufficient concerns had been raised about the status of Riverview patients to require the State to enter into a Consent Decree to protect their constitutional rights, including the rights Ms. Edson generally asserts were violated in this case. This document, though, does not provide Ms. Mayhew with facts from which she could draw the reasonable inference that the COs involved in the December 2, 2013 incident would violate Ms. Mayhew's rights. In fact, Ms. Edson states in her Second Amended Complaint that Riverview had in place policies and standards related to the use of restraint and seclusion when the incident took place. *Second Am. Compl.* ¶¶ 62–63, 65–67, 76. It is not foreseeable that terms of the Consent Decree provide a basis to conclude that the COs, who were not at Riverview during the problems that gave rise to the Consent Decree, would violate institutional policies and use restraints or seclusion without good cause.

Ms. Edson relies upon a second document, the CMS Statement of Deficiencies Report of May 10, 2013. In her opposition, Ms. Edson writes that "[i]n its Statement of Deficiencies, CMS found that Riverview patients were in immediate jeopardy resulting from the presence of CO's armed with handcuffs and Tasers." *Id.* at 8. She cites A000, A115, A144, A145, A154, and A164 of the CMS report. *Id.* A000 states:

> The hospital failed to ensure that patients were free from all forms of abuse or harassment based on the inappropriate use of Tasers and

27

> handcuffs identified on May 10, 2013 (see Tags A-0115 and A-0145). The
> role of law enforcement personnel on the unit was not limited to the
> supervision of prisoners who were also patients of the Hospital. The
> Hospital permitted law enforcement personnel to used (sic) Tasers and
> handcuffs on any patient in the unit, and allowed them to intervene for
> any patient who they perceived as demonstrating threatening behavior.
> This practice placed all patients on the unit at risk of being handcuffed
> or Tasered by law enforcement personnel, regardless of their status.

*CMS Report* A100 at 1. However, a review of the CMS Report confirms that its reference to "law enforcement personnel" was not to COs, but to the "Kennebec Sheriff Officers (KSO)." *Id.* Similarly, A115 addresses "the use of a Taser in a patient who was in a non-threatening position on the floor and the use of hard handcuffs by <u>sheriff officers</u> to escort patients to seclusion and restraint would be that patients were placed in danger of physical harm, pain and mental anguish." *Id.* A115 at 7 (emphasis supplied). A144, A145, A154 and A164 also involve members of the Kennebec County Sheriff's Department. *See id.* A144 at 9–10 ("In an interview with KSO Officer 1"); A145 at 12 ("KSO will observe for any situation that appears to be escalating and may intervene without staff request if there is imminent danger"); A154 at 18 ("Taser was deployed by the KSO officer . . . Client was handcuffed"); A164 at 20 ("In an interview with KSO Officer 1"). Furthermore, the CMS Report recommendations were not directed to COs, but to members of the Kennebec Country Sheriff's Department, and were for education of staff and of the sheriff deputies and for internal clarification and review:

> The interim safety plan included immediate education for staff and
> Kennebec Sheriff Officers (KSO), clarification of protocols, and review of
> all incidents by the hospital.

*Id.* A100 at 1.  The KSOs have since been removed from Riverview.[9]  *Second Am. Compl.* ¶ 104 n.1, http://www.pressherald.com/2014/09/21/at-state-run-riverview-danger-and-dysfunction-pervasive/ (*Herald Article*).

The most that can be gleaned from the CMS Report is that it placed Riverview officials and perhaps Commissioner Mayhew on generalized notice that the occasional presence of law enforcement officers at Riverview with Tasers and handcuffs would require education of both the staff and the deputies.  Again, though, the CMS Report says nothing about a history of abuse by COs generally or by the COs involved in the incident on December 2, 2013.  Therefore, this Report does not demonstrate that Ms. Mayhew knew of and disregarded complaints concerning the COs' misconduct.  *See Andrews v. Fowler*, 98 F.3d 1069, 1079 (8th Cir. 1996) (holding that complaints about former officers' conduct, other than the officer involved in the alleged incident, were not sufficient to demonstrate that the Mayor acted with deliberate indifference).  Moreover, even assuming this document put Ms. Mayhew

---

[9]    Although Commissioner Mayhew distinguishes between the deputy sheriffs and the COs, the Second Amended Complaint and its attachments do not explain why Commissioner Mayhew promulgated a policy to substitute COs for deputy sheriffs.  Ms. Edson vigorously contends that the decision to place COs on the Lower Saco Unit was not only without justification but led inexorably to patient abuse.

Based on this record alone, however, it is not unreasonable to infer that COs specifically assigned the Lower Saco Unit, who receive special training on how to deal with psychiatric patients, and who have daily interactions with the staff and the patients, would be at least as capable of responding appropriately to conflict within the Unit as deputy sheriffs who are charged with handling the wide range of criminal matters in Kennebec County, and whose contact with the Lower Saco Unit would largely be restricted to transporting patients to and from the facility and responding to emergency calls from the Unit.  This is especially true where, as here, there is no known history of abuse by the COs that Commissioner Mayhew decided to employ.

Of course, there would be a concomitant risk generated by placing untrained COs equipped with pepper spray and handcuffs directly on a Unit housing forensic patients.  One of the key issues in this lawsuit, as the parties acknowledge, is whether the COs were properly trained and in this motion, whether, if not, the responsibility for the failure may be placed with Commissioner Mayhew, not as a state government official but as an individual.

on generalized notice that placing law enforcement officers in the presence of at-risk patients could result in constitutional violations, the Report only identifies three incidents of allegedly inappropriate conduct by officers. *CMS Report* A154 at 18–19; B148 at 32–33. Three instances is not sufficient to put Ms. Mayhew on notice of "'widespread' abuse." *Ramírez-Lluveras,* 759 F.3d at 20.

The Court recognizes that there are some facial similarities between this case and *Guadalupe-Báez*. In that case, the First Circuit held that a DOJ report concluding that the Puerto Rico Police Department (PRPD) was "broken in a number of critical and fundamental respects" and that PRPD officers had "engage[d] in a pattern of practice of excessive force in violation of the Fourth Amendment" was sufficient to cross the plausibility threshold because the Report demonstrated that "such random and anonymous violence appears to be a predictable culmination of the systemic problems documented in the Report." *Guadalupe-Báez*, 819 F.3d at 512, 516–17. Similarly here, the Consent Decree and the CMS Report show generally that Riverview has had problems with patient abuse, including abuse by the KSOs. However, unlike in *Guadalupe-Báez*, in which the Report directly addressed the issues within the PRPD, which was the police department to which the rights-violators belonged, here, the CMS Report and Consent Decree say nothing about the COs who allegedly violated Ms. Edson's rights. It is hard to see how Ms. Mayhew could have inferred, from these documents, that the COs would violate Ms. Edson's rights. Additionally, as already discussed, the three instances concerning law enforcement officers in the CMS Report in this case do not demonstrate the same

"pattern of practice" or "systemic problems" with the law enforcement officers that the DOJ report revealed about the PRPD. *Id.* at 516. Therefore, neither Ms. Mayhew's decision to use COs at Riverview nor her failure to remove the COs based on the information from the Consent Decree and CMS Report amounts to deliberate indifference.

The final two documents do little to advance Ms. Edson's argument against Ms. Mayhew in her individual capacity. The third document is a May 2013 email exchange between Mary Louise McEwen, the Riverview Superintendent at the time of the incident, and a number of individuals, including Commissioner Mayhew. *Mayhew May 2013 Email* at 1–2. Superintendent McEwen's May 23, 2013 email addressed the use of Tasers at Riverview. *Id.* at 2. Apparently, Commissioner Morris of the Department of Public Safety vetoed the use of Tasers at Riverview and, in her email, Superintendent McEwen noted that "[r]ight now they have pepper spray which if deployed will probably necessitate the evacuation of the unit. I have advised them to call 911 for assistance either before and/or after use." *Id.* Superintendent McEwen noted discussions about using "other chemical devises that might pose less environmental concerns" and referenced a meeting with Commissioner Morris "to talk about long term solutions that will protect the safety of all." *Id.* Finally, she observed that while she and another person were on the unit, "there was a stat call and one of our employees was injured and is on his way to the hospital." *Id.*

The next day, Commissioner Mayhew forwarded Superintendent McEwen's email to two individuals whose titles are not part of this record, but it is apparent

that she is requesting that they perform a legal review. *Id.* at 1 ("I would really appreciate it if the two of you could connect today related to <u>the statutory and regulatory interpretations</u> governing these issues") (emphasis supplied). To describe the problem, Commissioner Mayhew listed hundreds of staff injuries at Riverview over the last two plus years, including instances in which staff members had been punched seventeen times before staff could stop the client, punched in the face when a client was in five-point restraints, attacked by a client causing broken bones in the ankle and foot necessitating surgery, and stabbed by a client in the face with a pen, requiring surgical removal. *Id.* She said that all of these incidents had happened in the last year and were forensic clients. *Id.*

Again, the most the Court can infer from these emails is that there were some potential concerns about the use of Tasers and pepper spray by COs at Riverview. This alone is not enough to put Ms. Mayhew on notice that the COs presented a "substantial, unusually serious, or grave risk" of harm to patients' rights. *See Ramírez-Lluveras*, 759 F.3d at 21 (internal quotations omitted). The information contained in the emails does not make it reasonably foreseeable that the COs would violate policies and use Tasers or pepper spray without good cause or in an unsafe manner. Additionally, the email itself suggests that Ms. Mayhew was seeking advice about what actions MDHHS could legally take "to make sure that the staff and other patients are safe." *Mayhew May 2013 Email* at 1. This inquiry hardly evinces "reckless or callous indifference to the constitutional rights of others." *Guadalupe-*

*Báez*, 819 F.3d at 515 (quoting *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 92 (1st Cir. 1994)).

The last document is entitled "Jeanne Carroll v. State of Maine, Riverview Psychiatric Center, Preliminary Statement of Whistleblower Protection Act Violation." *Conditional License.* Within her whistleblower statement is a footnote that states in part that on September 13, 2013, the MDHHS Division of Licensing and Regulatory Services issued a "conditional license to Riverview, informing the administration that immediately upon the effective date of the conditional license the hospital 'shall promote and ensure patients' rights,' and 'shall ensure that patients are free from abuse.'" *Id.* at 4 n.3. In addition, according to the whistleblower statement, the conditional license required Riverview within two weeks of the date of the conditional license to "ensure that the least restrictive intervention which is effective will be utilized in cases of restraint or seclusion." *Id.* This document just discusses the general obligations to ensure that patients' rights are not violated.

In addition to the four cited documents, Ms. Edson discusses two post-incident documents: (1) a newspaper article from the Portland Press Herald dated September 21, 2014, and (2) a licensure complaint investigation report dated March 27, 2014. As described in the Second Amended Complaint, the Portland Press Herald article quotes Cary Cromwell, a former mental health worker, as saying that mental health workers had "little direction and training from supervisors" and that annual training was "non-existent." *Second Am. Compl.* ¶ 104; *Herald Article.* The Second Amended Complaint also quotes Dr. Jean-Joseph Dansereau, a psychiatrist on temporary

assignment to Riverview, who said "They have created the most dangerous psychiatric unit I've ever seen." *Id.* ¶ 105; *Herald Article.* Ms. Edson alleges that the deficiencies identified in the article about "non-existent" training were likely to result in violations of the constitutional rights of the patients, including Ms. Edson. *Second Am. Compl.* ¶ 106.

In the Investigation Report, staff members said that "the presence of the COs was outside the culture of the recovery model" and that "[i]t wasn't working . . . [n]obody knew what to do or when to do it." *Second Am. Compl.* Attach. 3 *Investigation Report #ME00015398* at 4. They also say that the use of pepper spray on Ms. Edson was excessive and that its use was a "system failure." *Id.*

Of course, both the newspaper article and the Investigation Report substantially post-date the December 2, 2013 Edson incident, and are relevant to this case only to the extent that they imply conditions at Riverview were so egregious that Commissioner Mayhew must have been on notice of them. In this sense, these documents confirm the contents of the other documents, namely that Riverview has had systemic problems for decades. Nevertheless, the issue here is the decision to place COs at Riverview[10] and other than Ms. Edson's incident with the COs, neither

---

[10] Although her opposition focuses on Ms. Mayhew's decision to place COs at Riverview and her failure to remove them, Ms. Edson, at times, also appears to be asserting a claim that Ms. Mayhew was deliberately indifferent to patient abuse committed by Riverview staff in general. *See, e.g., Second Am. Compl.* ¶¶ 108–14. The documents relied upon by Ms. Edson suggest systemic problems with Riverview staff in general and thus provide sufficient facts from which Ms. Mayhew could have drawn the inference that a substantial risk of harm exists at Riverview. Nevertheless, Ms. Edson does not plead any facts to suggest that Ms. Mayhew failed to act in light of this abuse. In fact, the documents suggest that a number of steps were taken to address the issues. For example, MDHHS entered into the Consent Decree to protect patients, *Second Am. Compl.* ¶¶ 16, 18; developed policies to address patient abuse, *id.* ¶¶ 62–63, 65–68, 76, 78; and replaced the KSOs, as well as the Superintendent.

the Investigation Report nor the article discusses any other specific instances of misconduct by the COs.  Like the Consent Decree, the article just discusses the patient neglect and abuse in general.  To put Ms. Mayhew on notice that the COs presented a grave risk of harm, Ms. Edson needed to demonstrate that the COs' abuse was truly widespread.  *See Ramírez-Lluveras*, 759 F.3d at 20.  The only instance of misconduct by the COs mentioned is Ms. Edson's incident, but isolated instances of unconstitutional activity are insufficient.  *See id.*

Nothing cited by Ms. Edson would have alerted Ms. Mayhew that the COs would violate the policies for restraint, seclusion or abuse by pepper spraying and restraining Ms. Edson without cause.  There are no allegations of prior instances of violations by these COs or of a widespread history of abuse by the law enforcement officers at Riverview generally.  Therefore, Ms. Mayhew cannot be held liable under a deliberate indifference theory for her assignment of COs to Riverview, her failure to remove the COs, or her failure to remove their handcuffs, Tasers, or pepper spray.

### 2.    Failure to Train

In Count IV, Ms. Edson asserts a § 1983 claim against Ms. Mayhew premised on a theory of a failure to train.  *Second Am. Compl.* ¶¶ 100–07.  Similar to supervisory liability in general, a responsible official may be liable if she "supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation."  *Sanchez*, 590 F.3d at 49 (quoting *Zapata*, 175 F.3d at 44).

---

*Herald Article*.  Therefore, there are also not sufficient facts to suggest that Ms. Mayhew was deliberately indifferent to patient abuse by Riverview employees generally.

35

Ms. Edson pleads sufficient facts to establish that there may have been inadequate training and that Ms. Mayhew may have had notice that placing law enforcement officers at Riverview without education of the staff and officers could result in constitutional violations.  *See CMS Report* A100 at 1 (recommending education for staff and KSOs at Riverview); *Second Am. Compl.* ¶ 104 ("[M]ental health workers had little direction and training from supervisors and . . . annual training was non-existent") (internal quotations omitted).

However, Ms. Edson fails to plead any affirmative link of this failure to train to Ms. Mayhew.  Ms. Edson must establish that Ms. Mayhew had some degree of control over the training of the COs or staff at Riverview.  *See Zapata*, 175 F.3d at 44 ("[L]iability attaches if a *responsible* official supervises, trains, or hires a subordinate with deliberate indifference") (emphasis added); *see also Maldonado-Denis*, 23 F.3d at 582 (holding supervisor can be liable for deliberate indifference "*if he had the power and authority to alleviate it*") (emphasis added).  Ms. Edson states that Ms. Mayhew is the Commissioner and policymaker for MDHHS and Riverview.  *Second Am. Compl.* ¶ 5.  As Commissioner, Ms. Mayhew oversees multiple departments and has vast responsibilities, and she cannot by her role or position of authority alone be said to be individually liable.  *See Guadalupe-Báez*, 819 F.3d at 515.

Ms. Edson also cites Ms. Mayhew's "training obligations" in the Consent Decree.  *Pl.'s Opp'n* at 12.  However, the cited portions of the Consent Decree have nothing to do with Ms. Mayhew's responsibilities over the training of the COs or staff.  *See Consent Decree* ¶¶ 34(a), 118–29, 205–07, 213–19.  The Decree just places general

36

obligations on the defendants, including the Commissioner, to assure the protection of patients' constitutional rights.  *See Feliciano-Hernández*, 663 F.3d at 534 ("[W]e have repeatedly held that . . . broad allegations against high-ranking government officials fail to state a claim").  In fact, Ms. Edson admits that it is the Superintendent of Riverview who is involved in the day-to-day operations at Riverview.  *Second Am. Compl.* ¶ 6.  The only connection that Ms. Edson establishes between Ms. Mayhew and the COs is that Ms. Mayhew made the decision to place COs at Riverview and that the contract was between MDHHS and the Maine Corrections Department.  *Second Am. Compl.* ¶¶ 31, 101.  The mere fact that Ms. Mayhew made a policy decision that led to the MDHHS's employment of the COs is not sufficient to hold her liable for a failure to train.  *See Marrero-Rodríguez v. Mun. of San Juan*, 677 F.3d 497, 503 (1st Cir. 2012).

### 3.     Custom, Practice & Policy Liability

In Count VI, Ms. Edson asserts a § 1983 claim premised on a theory of custom, practice, and policy liability.  *Second Am. Compl.* ¶¶ 115–19.  In *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015), the First Circuit wrote that supervisory liability may proceed under § 1983 for "formulating a policy, or engaging in a custom, that leads to the challenged occurrence."  *Id.* at 222 n.5 (quoting *Maldonado-Denis*, 23 F.3d at 582).

Here, there is no allegation that the Riverview policies led to the December 2, 2013 incident.  Nor has Ms. Edson claimed that the policies in place at Riverview were themselves deficient.  To the contrary, in her Second Amended Complaint, Ms.

Edson quotes the then-existing Riverview policies on the use of force, *Second Am. Compl.* ¶¶ 62–63, 65–68, 76, 78, and alleges that the COs violated those policies when they pepper-sprayed and handcuffed her and that the staff again violated those policies when they failed to document and report the incident accurately. *Id.* ¶¶ 64, 69–75, 77, 79, 80.

Instead, Ms. Edson alleges that an unlawful "custom" concerning the reports of abuse led to the challenged occurrence. In her Second Amended Complaint, Ms. Edson says that the Portland Press Herald article reports that there was a "workplace culture" of provoking responses from patients and ostracizing and/or marginalizing employees who reported abuse. *Id.* ¶ 115. She also alleges that the hospital's culture was to "look the other way" when patients were abused. *Id.* ¶ 117. However, Ms. Edson does not suggest that Ms. Mayhew herself engaged in this custom. In fact, she suggests that the staff actively concealed the abuse and failed to report the incident immediately to MDHHS. *Id.* ¶¶ 69, 80. The only statement connecting Ms. Mayhew to this "custom" is that Ms. Mayhew "knew or had reason to know of the 'look the other way' culture toward patient abuse at Riverview, but . . . took no action to end it." *Id.* ¶ 118. This statement, which essentially parrots the standard for deliberate indifference, is not sufficient. *See Feliciano-Hernández*, 663 F.3d at 534. Ms. Edson does not plead facts to show that there was a history or widespread culture of covering up this kind of abuse sufficient to put Ms. Mayhew on notice. The single incident of alleged misreporting after Ms. Edson's instance is not enough.

### 4.   Equal Protection Claim

In Count IX, Ms. Edson brings a claim against Ms. Mayhew under the Equal Protection Clause. *Second Am. Compl.* ¶¶ 131–34. Neither party briefed the Equal Protection issue. However, the Court finds the same defects present in this claim that are present in the other constitutional claims against Ms. Mayhew as an individual. The only possible Equal Protection allegations in the Second Amended Complaint state that "[t]here is no rational basis for the different treatment inflicted on Ms. Edson on or about December 2, 2013, and other similarly situated Riverview patients" and that "[t]he Defendants' conduct was the legal cause of the violation of Ms. Edson's federally protected rights." *Id.* ¶¶ 133–34. These statements simply mimic the legal elements for an Equal Protection violation, without explaining how Ms. Mayhew's own direct actions violated the Equal Protection Clause or how she was deliberately indifferent to other individuals' violations. These sort of conclusory statements are not sufficient to overcome a motion to dismiss. *Feliciano-Hernández*, 663 F.3d at 534 ("These are exactly the sort of 'unadorned, the-defendant-unlawfully-harmed-me accusation[s]' that both we and the Supreme Court have found insufficient") (quoting *Iqbal*, 556 U.S. at 678).

In sum, the Court grants the Motion to Dismiss with respect to the individual capacity constitutional claims against Ms. Mayhew. The Court's decision not to hold Ms. Mayhew liable is in line with precedent. The Supreme Court and the First Circuit have been reluctant to impose personal liability under § 1983 and similar statutes against high government officials who administer large agencies. In the seminal case of *Iqbal*, the Supreme Court rejected a claim against Attorney General John Ashcroft

39

and Federal Bureau of Investigation (FBI) Director Robert Mueller, which had attempted to fix liability on the ground that Attorney General Ashcroft was the "principal architect" of the policy that led to the plaintiff's detention and that Director Mueller was "instrumental" in adopting and executing it. *Iqbal*, 556 U.S. at 669. The *Iqbal* Court deemed those allegations too conclusory to be entitled to an assumption of truth. *Id.* at 681.

Subsequently, in *Soto-Torres v. Fraticelli*, 654 F.3d 153 (1st Cir. 2011), the First Circuit rejected a claim against the Special Agent in Charge (SAC) of the FBI's Puerto Rican operations, who had been sued in his individual capacity, for the alleged use of excessive force by FBI agents in executing an arrest warrant upon the plaintiff. *Id.* at 155–57.[11]   In *Soto-Torres*, the First Circuit addressed the SAC's qualified immunity defense and wrote that "all high officials in charge of a government operation 'participate in' or 'direct' the operation." *Id.* at 159. But the First Circuit interpreted *Iqbal* as ruling that this type of involvement is "plainly insufficient to support a theory of supervisory liability and fails as a matter of law." *Id.*

A good example of the application of this principle is *Marrero-Rodriguez v. Municipality of San Juan*, 677 F.3d 497 (1st Cir. 2012), which arose out of a tragic accident during police training. *Id.* at 500–01. In violation of a number of protocols, a lieutenant in the San Juan police force shot another officer during a training exercise, causing the officer's death. *Id.* The decedent's wife and two sons filed suit

---

[11]     *Soto-Torres* was a *Bivens*-action, but as the First Circuit has written, a *Bivens* action is "the federal analog to § 1983 suits against state officials." *Hernandez-Cuevas v. Taylor*, 836 F.3d 116, 118 n.1 (1st Cir. 2016) (quoting *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 93 n.1 (1st Cir. 2013) (quoting *Soto-Torres*, 654 F.3d at 158)).

under § 1983 against the Municipality of San Juan, the Mayor of San Juan, supervisory officers, and the officers who were directly involved in the incident. *Id.* at 501. The *Marrero-Rodriquez* Court found that the complaint stated a claim against the officers directly involved in the incident. *Id.* at 502. Emphasizing their direct role in the conduct of the training exercises, their involvement in the structuring of the lethal training that day, and their failure to implement policies, protocols, or correct training, the First Circuit also determined that the complaint stated a claim against "the police defendants not present that day, but with direct responsibility for training." *Id.* at 502–03. As regards the mayor, however, the First Circuit stated that "[i]t takes more than this . . . to assert a § 1983 claim against those who have no personal involvement of any sort in the events, such as the Mayor." *Id.* at 503. The First Circuit pointed out that the "Mayor is not amenable to suit, as pled in the complaint, merely because he is Mayor." *Id.* The First Circuit allowed the case to proceed against the officers directly involved, the officers directly responsible for training and supervising the officers directly involved, but not against the Mayor. *Id.*

As there is no evidence in this case that Riverview did not have appropriate policies in place or that Ms. Mayhew was on notice that the COs would violate these policies, and as there is no allegation that Ms. Mayhew as Commissioner of MDHHS was or should have been more directly involved in the actual training of the COs or staff, Ms. Mayhew becomes like the Mayor of San Juan, subject to dismissal.

41

## B.     Negligent Supervision under Maine Law

In her motion, Ms. Mayhew agrees that the Maine Supreme Judicial Court adopted the tort of negligent supervision in *Fortin v. The Roman Catholic Bishop of Portland*, 2005 ME 57, ¶ 39, 871 A.2d 1208.  *Def.'s Mot.* at 13–14.  The *Fortin* Court wrote that "if a plaintiff asserts the existence of facts that, if proven, establish a special relationship with a defendant in accordance with section 315(b) of the Restatement (Second) of Torts, an action may be maintained against the defendant for negligent supervision liability in accordance with section 317 of the Restatement." *Fortin*, 2005 ME 57, ¶ 39, 871 A.2d 1208.  Ms. Mayhew assumes for purposes of her motion that a person, like Ms. Edson, who had been committed to Riverview, would thereby qualify as having "special relationship" with the state of Maine.  *Def.'s Mot.* at 14 ("Assuming for sake of argument that there was a special relationship here").

Despite this assumption, Ms. Mayhew contends that the tort of negligent supervision in Maine is available only against an employer, not against an individual. *Id.*  Ms. Edson disagrees and argues that the tort of negligent supervision is sufficiently broad in Maine to include a claim against the individual negligent supervisor.[12]  *Pl.'s Opp'n* at 17–18.

The Maine Supreme Judicial Court was not called upon to address this issue in *Fortin* because the sole defendant in the lawsuit was The Roman Catholic Bishop

---

[12]     Ms. Edson vigorously argues that she had a special relationship with Commissioner Mayhew, a point conceded for the sake of argument by Commissioner Mayhew.  *Compare Pl.'s Opp'n* at 17–18, *with Def.'s Mot.* at 14.  The Commissioner's concession is consistent with the Maine Supreme Judicial Court's conclusion in *Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, ¶ 21, 970 A.2d 310 (concluding that a patient admitted to a psychiatric hospital had "alleged facts that, if proven, would constitute a special relationship . . . to survive a motion to dismiss").

of Portland, whom the *Fortin* Court referenced as "the Diocese"; there is no indication in the opinion that the Bishop was sued in his individual capacity.[13]   Although the Maine Supreme Judicial Court has addressed the tort of negligent supervision on a number of occasions since *Fortin*, it has not been called on to resolve whether under Maine law, a plaintiff may make a claim against the supervisor as an individual for negligent supervision.  *See Picher v. Roman Catholic Bishop of Portland*, 2013 ME 99, 82 A.3d 101 (claim against the Bishop of Portland, a corporate sole); *Gniadek v. Camp Sunshine at Sebago Lake, Inc.*, 2011 ME 11, 11 A.3d 308 (claim against Camp Sunshine, a nonprofit corporation); *Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, 970 A.2d 310 (claim against psychiatric hospital).  In general, the tort of negligent supervision has been described as arising "in the context of the duty an employer might owe for the conduct of an employee."  *See Laurence v. Howard Sports-Topsham*, No. BATSC-CV-07-062, 2009 Me. Super. LEXIS 129, at \*16 (Me. Super. Ct. May 5, 2009).   Most of the decisional law in Maine after *Fortin* has focused on whether a special relationship exists between the plaintiff and the defendant, not whether a supervisor may be held individually responsible under the tort of negligent supervision.

The parties cited no Maine law on this narrow issue, but each found one case from other jurisdictions, standing, they said, for different propositions. Commissioner Mayhew cited a decision from New Jersey, *Duran v. Warner*, No. 07-5994 (JBS/AMD), 2013 WL 4483518, at \*8 (D.N.J. Aug. 20, 2013), which she said

---

[13]     In *Picher v. Roman Catholic Bishop of Portland*, 2013 ME 99, ¶ 1, 83 A.3d 101, the Maine Supreme Judicial Court referred to the Roman Catholic Bishop of Portland as "a corporation sole."

holds that the tort of negligent supervision does not permit a claim against the individual supervisor. *Def.'s Mot.* at 14. Ms. Edson cited a decision from New York, *Krystal G. v. Roman Catholic Diocese of Brooklyn*, 933 N.Y.S.2d 515, 522 (N.Y. Sup. Ct. 2011), which she says stands for the proposition that individual liability may attach. *Pl.'s Opp'n* at 18.

In *Duran*, the United States District Court for the District of New Jersey wrote unequivocally that "[u]nder New Jersey law, a negligent supervision claim can only be brought against the employer entity and is not cognizable against the individual supervisor." 2013 WL 4483518, at *8; *see PJ Food Serv. v. APCO Petroleum Corp.*, No. 16-1853, 2016 U.S. Dist. LEXIS 170401, at *20 n.5 (D.N.J. Dec. 9, 2016). By contrast, the *Krystal G.* case does not directly address whether the tort of negligent supervision may be brought against a supervisor as an individual. 933 N.Y.S.2d at 525. The *Krystal G.* Court concluded that "a corporate officer or agent may be found liable for negligently supervising a third party that was responsible for the plaintiff's injury, even if that corporate officer was acting in his or her official capacity." *Id.* Although the New York Supreme Court held that the named person could be held liable under a theory of negligent supervision "even if . . . acting in his or her official capacity," it did not explain whether the individual could also be held liable in a personal capacity. *Id.*

Given the sparse, out-of-state authority the parties have cited for a proposition of Maine law, the Court is not sufficiently confident about the status of the tort of negligent supervision in Maine to grant or deny the pending motion to dismiss.

Instinctively, it may well be that the tort of negligent supervision in Maine allows a lawsuit only against the employer or an employee in her official capacity, a result that would be consistent with the Court's conclusion regarding the § 1983 claims. Nevertheless, the argument is so undeveloped that the Court prefers to defer ruling. Instead, the Court will dismiss the motion without prejudice, allowing Commissioner Mayhew to regroup and challenge this part of the lawsuit on a fuller record and more complete argument.

## VII.   CONCLUSION

The Court GRANTS in part and DISMISSES in part Mary Mayhew's Motion to Dismiss Individual Capacity Claims (ECF No. 65).  The Court GRANTS Mary Mayhew's motion to dismiss as to all counts alleging a violation of 42 U.S.C. § 1983, including Counts IV, V, VI, and IX.  The Court DISMISSES without prejudice Mary Mayhew's motion to dismiss Count XII.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 28th day of February, 2017